**STATE of Missouri, Respondent,**

v.

**Jewel GRAY, Appellant.**

**No. WD 31629.**

Missouri Court of Appeals,
Western District.

May 4, 1981.

Peter N. Sterling, Acting Public Defender, Gary L. Gardner, Asst. Public Defendant, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Catheryn B. Starke, Asst. Atty. Gen., Kansas City, for respondent.

Before DIXON, P. J., WASSERSTROM, C. J., and NUGENT, J.

WASSERSTROM, Chief Judge.

The question for decision is whether the trial court properly permitted the use of the transcript of prior testimony when one of the State's witnesses failed to appear. This question arises in the context of a jury trial which resulted in a verdict of guilty of the sale of controlled substance.

On November 2, 1978, John Cornell and Kent McGregor were an investigating team for the Metropolitan Drug Squad in Kansas City, Missouri. They arranged an introduction to defendant through an informer, and Cornell then made a "buy" of ten Ritalin pills for $100. Defendant was arrested and brought to trial, and both Cornell and McGregor testified for the prosecution. That trial resulted in a hung jury.

A retrial was set and the State's witnesses, including McGregor, appeared ready to testify. However, defendant did not appear, and the trial had to be reset.

The retrial did begin on November 14, 1979. The prosecution expected McGregor to appear, but when the time for his testimony came, he was not present. The following colloquy then appeared between court and counsel:

"THE COURT: Go ahead and tell us about your problem.

MS. PETREN: Okay. At the first trial Kent McGregor, one of the State's witnesses, was present and testified and I have before me, and I also believe Cynthia Dodge has had before her for some time, a transcript of his testimony at the first trial.

A second trial in regards to Jewel Gray was scheduled and Kent McGregor was on his way here and appeared at that particular hearing. Jewel Gray failed to show, so he had to be sent back to Parsons, Kansas.

Knowing that Jewel Gray was scheduled for this week, I notified Kent McGregor last week, through Chris Maloney, that he would be needed for trial. At that time he said that he would be on

a search warrant, but he would try to make it.

I have talked to him personally this morning and gotten in touch with him several times and left messages. And he is evidently on surveillance that involves a sizable amount of drugs and after the surveillance they must execute a search warrant on several premises. So for that reason he is in Parsons, which is a three and a half hour drive and as a police officer he has duties in Parsons, Kansas, making him unavailable for trial.

And the State would like to ask for use of the transcript of the proceedings at which he testified at the first trial to be read into evidence.

MS. DODGE: Is he under subpoena?

MS. PETREN: No, it's not necessary. He might have been under subpoena the very first trial, but he is not under subpoena in this trial.

THE COURT: He lives in Parsons, Kansas?

MS. PETREN: He lives in Parsons, Kansas. He's head of the drug unit over there.

THE COURT: I see. All right.

MS. DODGE: What attempt have you made to contact him?

MS. PETREN: I made attempts last week and have left messages with him. Last week Chris Pogy Maloney, who knows Kent, called him during the week and he said he was on a search warrant but as far as he could see he would try to be here. I called him last night twice, left a message with him, called him at his home this morning and he wasn't home. I called his office again this morning and he wasn't there. So I finally was able to get in touch with someone who works there, because he only has a part-time secretary that comes in at noon, so the lady got in touch with the part-time secretary and was able to contact Kent McGregor who told me at that time he was on a search warrant, a surveillance that would lead to search warrants that involved a sizable amount of drugs and could not leave his job in Parsons.

MS. DODGE: You have actually spoken to him on the phone?

MS. PETREN: Yes, about fifteen minutes ago when they got him through the police radio and he responded at a prearranged number for me to call him in case he couldn't be reached over the police radio.

THE COURT: All right.

MS. DODGE: I would object to the use of the transcript from the prior proceeding. I believe it denies my client the right of confrontation and cross-examination and thus denies him his constitutional right to a fair trial and due process.

THE COURT: The Supreme Court of the United States, in *California v. Green*, 399 U.S. 149 [90 S.Ct. 1930, 26 L.Ed.2d 489], held that the use of transcripts of a witness testimony given in some former proceeding did not violate a defendant's Sixth Amendment right of confrontation when the witness is unavailable at trial and the accused had full opportunity to cross-examination of the witness at the time he testified.

We have been doing that in this Court for a long time and the witness is not here in this case because of the fault of the defendant. The defendant failed to appear when he was set for trial the last time and I revoked his bond, that's why he's now in jail.

MS. DODGE: I don't believe Mr. McGregor's absence today is due to the fault of the defendant. He's absent due to his duties elsewhere."

The transcript of McGregor's testimony at the first trial was then read to the jury. The propriety of allowing that to be done is the sole point raised by defendant on this appeal.

■ The Sixth Amendment to the Constitution of the United States and Article 1, Section 18(a) of the Missouri Constitution guarantees the right of a criminal defendant to confront and cross-examine the adverse witnesses. An exception is permitted on the grounds of necessity where a witness becomes unavailable who testified at a previous trial and was at that time subject to

cross-examination. For that exception to apply, the prosecution must normally show as a fact that the witness is unavailable. In order to establish that unavailability, the prosecution has the burden of proving a good faith effort, exercising reasonable diligence, to obtain the presence of the witness at trial. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *State v. Murphy*, 592 S.W.2d 727 (Mo. banc 1980); *State v. Kain*, 330 S.W.2d 842 (Mo. 1960).

At one time McGregor would have been considered to be unavailable simply by reason of the fact that he was outside the State of Missouri and therefore beyond the reach of a Missouri subpoena. That state of the law, however, changed with the adoption throughout most of the nation of the Uniform Law to Secure Attendance of Witnesses From Within or Without State in Criminal Proceedings. The Uniform Act has been adopted in both Missouri and Kansas. Section 491.400 to 491.450, RSMo 1978; K.S.A. 22–4201 to 22–4206. In view of the Uniform Act, there is effective means by which a witness in a criminal case can be subpoenaed in Kansas to attend a criminal trial in Missouri.

In *Barber v. Page, supra,* the United States Supreme Court recited the former rule that any witness beyond the jurisdiction was unavailable but then went on to hold: "Whatever may have been the accuracy of that theory at one time, it is clear that at the present time increased cooperation between the States themselves and between the States and the Federal Government has largely deprived it of any continuing validity in the criminal law." The court in that connection made footnote reference to the Uniform Act. The court went on to hold that since no effort had been made by the prosecution to utilize the Uniform Act or alternative methods to reach the witness, there had not been a reasonable good faith effort to produce the witness at trial.

A heavy majority of the cases which have considered this matter since the *Barber* decision hold that the prosecution must at-tempt to utilize the Uniform Act, if available, in order to show a good faith effort on its part to produce the witness at trial. *Gorum v. Craven*, 465 F.2d 443 (9th Cir. 1972); *Eastham v. Johnson*, 338 F.Supp. 1278 (D.C.Mich. 1972); *State v. Ray*, 123 Ariz. 171, 598 P.2d 990 (banc 1979); *State v. Waits*, 92 N.M. 275, 587 P.2d 53 (1978); *Brooks v. State*, 35 Md.App. 461, 371 A.2d 674 (1977); *Anderson v. State*, 362 So.2d 1296 (Ala.Cr.App. 1978). *Contra: State v. Kirk*, 211 Kan. 165, 505 P.2d 619 (1973); *State v. Davis*, 2 Kan.App.2d 10, 573 P.2d 1124 (1978); *State v. Martin*, 73 Wash.2d 616, 440 P.2d 429 (1968). (It should be noted, however, that *Martin* was decided only two days after the decision in *Barber* and makes no reference to that opinion. *Martin* cites and relies upon a number of decisions which predated *Barber*.)

The closest Missouri authority in point is *State v. Brookins*, 478 S.W.2d 372 (Mo. 1972). There the prosecution took the deposition of a witness who was about to move from Missouri to Texas. Just before trial the prosecutor tried unsuccessfully to serve a subpoena on the witness in St. Louis, but made no effort to secure any subpoena for service in Texas under the Uniform Act. Under those circumstances, the court held that it was error to allow the use of the deposition.

■ *Brookins* appears in harmony with the majority rule which requires utilization of the Uniform Act, where available, as a condition precedent to the use of former testimony. To the extent that *Brookins* leaves any question in that regard, we now approve and adopt that majority rule in this State. The prosecution in the present case not having sought to utilize the Uniform Act, it did not make a sufficient effort to secure the attendance of McGregor, and his former testimony should not have been admitted.

The State argues that even if the admission of that former testimony was error, nevertheless such error was harmless because McGregor's testimony was simply cumulative to that of Cornell. One major difficulty in the way of accepting that ar-

gument lies in the fact that the State's case lacked something by way of jury persuasiveness, as evidenced by the hung jury in the first trial when both Cornell and McGregor testified. It would seem that the loss of one of its only two witnesses would be seriously harmful to the prosecution. This appraisal of the importance of McGregor's testimony is much emphasized when attention is given to what occurred after the jury retired. The record shows the following:

> "THE COURT: I have this inquiry from the jury. 'We would like to see the testimony of Officer McGregor that was read by the prosecutor. There is a question in our minds as to the dates mentioned.' And it's signed, 'Curtis E. McDaniels.'
>
> I will go along with counsel and say that under the law I am not permitted to send a transcript of the testimony of any witness to the jury room. The members of the jury must rely on their collective memory to remember the testimony given at the trial."

In light of that inquiry made by the jury, it becomes crystal clear that the jury paid very close attention to McGregor's testimony.[1] It cannot be said beyond a reasonable doubt that the jury would have come to the same conclusion without the benefit of his testimony.

The result reached here does not impose any impractical difficulties on the prosecution. The prosecution should be held to an obligation to check in advance of trial to see as to the availability of its witnesses. The prosecutor here in fact did so and found out a week in advance of the trial that McGregor might not appear voluntarily. When that strong possibility was disclosed, the prosecutor had three courses of action open. First, the prosecution could have asked for a continuance until such time as McGregor could give assurance of his presence. As a second choice, the prosecution could have sought a subpoena under the Uniform Act, and if the court in Kansas could be shown that it would create an undue hardship to Kansas law enforcement if McGregor were required to drop his surveillance and attend court in Missouri, then the Kansas court would be authorized under K.S.A. 22–4202 to decline to issue a summons. Under such a ruling by the Kansas court, the prosecutor in this case could have made a complete showing of reasonable diligence in trying to secure the presence of McGregor, and his former testimony could have been read. Or, as a third course of action, the prosecution could have accepted and acted upon the analysis urged by the State on this appeal, to the effect that McGregor's testimony was only marginally useful and its absence would have no significant effect; and it could proceed to trial on the willing gamble that: (a) McGregor might appear in time; (b) if not, the trial court might grant a continuance during trial to allow McGregor further time; or (c) at worst the prosecution could always rely on the testimony of Cornell alone without the corroboration of McGregor.

Even though the restriction here announced may cause inconvenience to the prosecution, that inconvenience must yield to the importance of protecting defendant's right to give the jury opportunity to judge McGregor's credibility based upon face to face observation. Because of the erroneous admission of McGregor's former testimony, the judgment is reversed and the cause is remanded for a new trial.

DIXON, J., concurs.

NUGENT, J., dissents in separate opinion filed.

---

1. The transcript of McGregor's testimony from the first trial contained a discrepancy with respect to the date of the offense. At one point, he placed the events in question to have occurred on October 7, 1978; but he also testified to the events occurring on Novemeber 2, 1978, as alleged in the indictment and as testified to by Cornell. Apparently the jury here concluded that McGregor inadvertently erred in answering in the affirmative to a question as to whether the events happened on October 7. In any event, the jury obviously scrutinized McGregor's testimony with extraordinary care.

NUGENT, dissenting.

The court here states that the sole issue on this appeal is the propriety of allowing the prosecutor to read the transcript of McGregor's testimony at the first trial. The question must be refined. The precise question is: did the trial court abuse its discretion in concluding that the prosecutor had "made a good-faith effort" to obtain McGregor's presence at the second trial? A full understanding of the facts leads, I am convinced, to the conclusion that, in these circumstances, the prosecutor made a good-faith effort to produce McGregor and, justifiably, truly expected him to appear.

Phillip Kent McGregor in November, 1978 was a deputy sheriff in Jackson County, Missouri, assigned to the Metropolitan Drug Squad in Kansas City. On November 2 he assisted John Cornell, a police department investigator, in an investigation which led to defendant's prosecution. McGregor was present when Cornell negotiated a purchase of a controlled substance from defendant. McGregor reviewed and co-signed Cornell's report of the incident and along with Cornell initialed the evidence.

At the time of defendant's first trial in September, 1978, McGregor had become Director of the nine-county Southeast Kansas Regional Narcotics Enforcement Unit at Parsons, Kansas. The first trial ended with a hung jury and a mistrial. A new trial was set for a day in October. McGregor appeared for that trial without having been subpoenaed, but defendant failed to appear.

One week before the second trial, in November, Ms. Petren, the prosecutor, notified McGregor that he would be needed again. He responded that he would be "on a search warrant, but that he would try to make it." Thereafter several times she left messages about the trial setting at McGregor's office. During the week she received word from McGregor that "he was on a search warrant but as far as he could see he would try to be" present at trial. Sometime before 11:00 a.m. on the day of trial, the prosecutor came to the point at which she planned to call McGregor as the state's third and last witness. He was not there. Ms. Petren said to the court, "I would like a brief recess at this time to get Kent McGregor. He's on his way in from Parsons. I want to make sure where he is." Following the recess, Ms. Petren advised the court that she had just learned in a telephone call to McGregor in Kansas that his surveillance pertained to a "sizable amount of drugs" and that, when it was completed, he would have to execute several search warrants. In response to defense counsel's inquiry as to whether McGregor was under subpoena, the prosecutor responded, "No, it's not necessary."

In reaching its decision in *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), the Supreme Court at 723, 88 S.Ct. at 1321 said: "We start with the fact that the State made absolutely no effort to obtain the presence of Woods [the witness] at trial other than to ascertain that he was in a federal prison outside" the state. On the basis of that fact the court at 724–25, 88 S.Ct. at 1321–22 held that, for the purpose of the confrontation requirement, "unless the prosecutorial authorities have made a good-faith effort to obtain . . . [the] presence [of the witness] at trial," a witness is not "unavailable". The key words in the holding, of course, are "good-faith effort."

The opinion of the court here states that "a heavy majority of the cases which have considered this matter since the *Barber* decision hold that the prosecution must attempt to utilize the Uniform Act, if available, to show a good faith effort . . . ." That assertion is accurate in so far as it goes, but it lightly brushes aside important factual distinctions between the cases it cites and this case. No cited case involved a witness who had twice before appeared at trial, apparently without subpoena on at least one of those occasions. No such case dealt with a situation where the prosecutor contacted the witness about his imminent appearance. Nor did any such case involve a witness whose willingness to appear was manifest and who personally assured the prosecutor that, despite possible difficulty, "he would try to make it" and clearly indicated that he expected to be present. No

such other prosecution concerned a witness who was a ranking law enforcement officer of demonstrated reliability and obviously continuing interest in the prosecution of a case he had helped investigate and make. No case thus cited involved a prosecutor whose expectation of the appearance of the witness was so apparent and justified in light of the interest of the witness as well as his earlier voluntary appearance or appearances.[1] No other such case had a witness who was engaged in pressing and important official duties at the time of trial.

In all of the cases cited by the majority, the party who tendered the transcript of the earlier testimony had done little or nothing to find or secure the attendance of the witness, to demonstrate the unavailability of the witness or to show a good-faith effort to procure his presence. In all of the cases so relied upon, apparently the *only* way to assure attendance would have been by subpoena. None of the missing witnesses appeared to be friendly to the prosecution (in those cases where the prosecutor was the proponent) or likely to appear voluntarily.

Nor in this case were defendant and his counsel without fault. The missing witness was present (without subpoena) at the second trial setting, but the defendant failed to appear. Moreover, defendant's counsel professed to be concerned only about defendant's right to confrontation of McGregor. Once she had her "error" in the trial court's ruling, however, she took no further steps, made no suggestion as to an alternative way of proceeding that might have guaranteed her client's right of confrontation.

Not a trial lawyer breathes who has not seen that sort of courtroom gamesmanship. "Box the judge in, get your error in the record and then coast the rest of the way!

You're home free!" In this case what *ought* defense counsel have done? The law imposes no *duty* on a defendant to do anything, such as to move for a continuance. *Gorum v. Craven*, 465 F.2d 443 (9th Cir. 1972). But to say that the law imposes no requirement upon a defendant to seek a continuance or to get out his own subpoena, is not the same as to say that a defendant is totally free to rest on assumed error and take absolutely no action when some reasonable alternative may be available. In this case ought not defendant have at least suggested that the trial be delayed until morning? In the meantime, a subpoena might have compelled attendance of the witness or he might have become free and again voluntarily and dutifully appeared as he had twice before.[2] The jury was not sequestered. The crisis arose at about 11:30 a.m. on the first day of trial. The next day was Friday. A subpoena could have been served. Perhaps McGregor's duties would have permitted his appearance by Friday morning, a few trial-hours away. Defendant might well have had his second live confrontation, if that is what he truly wanted. Had McGregor still not appeared, defendant would have been in no worse position.

The trial judge could not have been unaware of this alternative, but he heard no request for the short delay. Under the circumstances he must have concluded, as I do now, that defense counsel actually could not have cared less about a live confrontation with this particular witness. McGregor was, after all, an officer with six years experience in narcotics investigations, having participated in 400 to 500 drug buys. His testimony at the first trial in every material way corroborated that of his fellow officer, Cornell, and he had successfully withstood an able, vigorous and searching

1. Ms. Petren said in response to defense counsel's question as to whether the witness was under subpoena, "No, it's not necessary." Clearly, the prosecutor was surprised that McGregor's surveillance problems were, after an entire week, actually interfering with his appearance; surveillances lasting that long are not the rule.

2. In my experience, state law enforcement officers and federal agents responsible for the investigation and prosecution ("case agents") are very rarely subpoenaed unless they request it. As a rule, a telephone call to the officer, his agency or department or to his commander is sufficient.

cross-examination. Counsel's hope of confounding this experienced witness was almost zero. The truth of the matter was, that another *live* confrontation was to be avoided. The defendant here would have this court reverse his conviction on the ground that the prosecutor did not make a good-faith effort to produce the witness. Where such an argument is urged, we should not forget that old "Good Faith Avenue" is a two-way street.

The Uniform Act was devised not to create new rights or enhance established rights nor to raise yet another obstacle in a continually more complex obstacle course. Its purpose was to broaden the power of courts administering criminal justice to summon as witnesses for any party persons beyond the state's territorial jurisdiction. The terms of the Act are not mandatory. A party may summon or produce his witnesses in any way he chooses. Only a party who does nothing or too little under the circumstances brings the rule of *Barber v. Page* into play.

The majority in this case would make invocation of the Uniform Act mandatory, a condition precedent, a sine qua non to the use in a criminal case of pretrial testimony of an absent, out-of-state witness whose location is known or readily knowable. *Barber v. Page* does not hold that. It holds only that "a witness is not 'unavailable' for the purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."

Certainly, if a party invokes the Uniform Act to subpoena a witness from outside the state, that party may use the transcript of earlier (otherwise admissible) testimony of an unavailable witness so summoned. But the converse is not so. Prosecutors ought to be free to rely upon persons ordinarily considered to be reliable.[3]

The majority opinion also takes the position that the prosecution's "case lacked something by way of jury persuasiveness." The basis for the majority's view is twofold: the first trial ended in a hung jury, and the second jury was apparently puzzled by confusion in the evidence as to the dates mentioned.

As to the conclusion one may draw from the fact the first jury could not agree, we can only speculate as to the reason. For all we know, the jury hung eleven to one for acquittal or for conviction. We cannot know. One guess is as good as another.

On the other hand, the matter of the confusion as to dates is a question which can be answered. The only date prominently mentioned at trial was the date of the offense, November 2, 1978. In the transcript of McGregor's testimony read to the jury at the second trial, on one occasion (and *only* one occasion) the prosecutor, by an obvious slip of the tongue, misstated the date of the offense in a question to McGregor. She asked him, "Officer, on October 7 of '78, did you have occasion to make a drug buy that evening?" The witness responded that his partner did, obviously referring to the only purchase of drugs about which a breath of evidence was heard in the trial. Examination of the trial transcript reveals that the correct date was November 2, that is, the very date mentioned in the information and the date shown in the written police report signed by both officers and the date shown on the evidence envelopes initialed by both officers. Countless times before and after Ms. Petren's slip, the correct date was restated in questions by both counsel and the answers given by the

---

3. Otherwise, every out-of-state witness who has testified before in the case, for example, at a preliminary hearing, must be summoned pursuant to the Act, regardless of need or cost. Invocation of the Act is not a mere administrative function. In many if not most cases use of the Act will require interstate travel to and appearance in the foreign court by a representative of the state seeking attendance of the witness. This added expense—in some cases multiple expense—may unduly burden already meager prosecutorial resources and for no good reason. Federal prosecutors are all too familiar with the scores of cases in each federal district in which every year increasing numbers of state prosecutions are declined for the simple reason that the county cannot afford the costs incurred in bringing out-of-state witnesses back to testify.

state's witnesses. Thorough reading of the trial record shows that no real question existed as to the date of the transaction. In his brief defendant makes no mention of the jury's question about the date. Obviously, defendant did not draw the same inference the majority draws from that question.

The same careful reading of the trial record reveals that the case against defendant was ice cold. I strongly disagree with the court's opinion that it lacked persuasiveness. The case was a simple, one-buy drug case. Cornell, the officer who took the hand-to-hand delivery of the drug from defendant and who paid defendant for it, testified without contradiction or difficulty. No question arose as to the nature of the substance purchased; the proof matched the charge against defendant. McGregor's testimony tracked in every material way that of Cornell but added nothing new. McGregor was merely a corroborating witness. Cross-examination of the state's witnesses was fruitless. The defendant adduced no evidence at all. The case could have been strengthened only by a signed confession or by a video tape recording of the transaction.

In considering whether to sustain defendant's objection to the reading of the transcript, the trial judge may very well have had in mind the warning of the Supreme Court in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). In discussing whether one whose extrajudicial declaration had been heard by the jury could in reality have been shaken in his story by defendant's cross-examination, the court observed at 89, 91 S.Ct. at 220:

> Almost 40 years ago, in *Snyder v. Massachusetts*, 291 U.S. 97 [54 S.Ct. 330, 78 L.Ed. 674], Mr. Justice Cardozo wrote an opinion for this Court refusing to set aside a state criminal conviction because of the claimed denial of the right of confrontation. The closing words of that opinion are worth repeating here:
>
> "There is danger that the criminal law will be brought into contempt—that discredit will even touch the great im-

munities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free." 291 U.S., at 122, 54 S.Ct. at 338.

The trial judge here was in a better position than this court now is to assess the realities—the "gossamer possibilities of prejudice" to the defendant in denying him another live confrontation of the witness and in permitting his earlier trial testimony to be read.

The issue in this case is not whether the prosecutor took the wisest and safest course. She could have caused a subpoena to be served on McGregor. She could have sought a continuance. Even during trial she could have asked for and probably obtained a short delay until morning in which to subpoena or produce McGregor. The issue remains, nevertheless, whether, in overruling defendant's objection and in (implicitly) finding that the prosecutor had exercised a good-faith effort to secure the attendance of the witness, the trial court abused its discretion.

Whether the prosecutor has made a good-faith effort to bring a witness to trial is a factual question with respect to which the trial court has considerable discretion, not to be reversed except for manifest error. *State v. Williams*, 554 S.W.2d 524, 534 (Mo. App. 1977); *Howard v. Sigler*, 454 F.2d 115, 118 (8th Cir. 1972), *cert. denied*, 409 U.S. 854, 93 S.Ct. 188, 34 L.Ed.2d 98 (1972). What constitutes a good-faith effort and reasonable diligence on the part of the prosecutor turns on the facts of each case. *State v. Murphy*, 592 S.W.2d 727, 731 (Mo. en banc 1980); *State v. Lloyd* 337 Mo. 990, 996, 87 S.W.2d 418, 422 (1935); *Eastham v. Johnson*, 338 F.Supp. 1278, 1281 (E.D.Mich. 1972). Here the trial judge was fully justified in concluding under the circumstances that Ms. Petren was surprised by McGregor's failure to appear. Unquestionably that was his conclusion because he instructed her to advise the jury that "Mr. McGregor is not able to be here, he resides in

Parsons, Kansas and we have been waiting for him and he hasn't appeared ... and can't be here ...." The circumstances and the prosecutor's unchallenged explanation amply supported the conclusion that she had made a good-faith effort to produce McGregor. We should not disturb that finding. *United States v. Harless*, 464 F.2d 953, 955 (9th Cir. 1972). The admission of the transcript was not erroneous. I would affirm the judgment.

For the foregoing reasons I respectfully dissent.